# UNITED STATES DISTRICT COURT
# DISTRICT OF IDAHO

DANIEL HIATT,

    Petitioner,

    vs.

COMMISSIONER OF SOCIAL SECURITY,

    Respondent,

Case No.: 1:18-cv-00429

**MEMORANDUM DECISION AND ORDER**

---

Before the Court is Petitioner Daniel Hiatt's Petition for Review (Dkt. 1), seeking review of the Social Security Administration's denial of benefits under the Social Security Act for lack of disability. This action is brought pursuant to 42 U.S.C. § 405(g). Having carefully considered the record and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. ADMINISTRATIVE PROCEEDINGS

On August 28, 2013, Daniel Hiatt ("Petitioner") protectively filed an application for Title II and Title XVI benefits, alleging disability beginning November 15, 2009. These claims were initially denied on November 21, 2013 and, again, on reconsideration on February 25, 2014. On April 24, 2014, Petitioner filed a Request for Hearing before an Administrative Law Judge ("ALJ"). On September 25, 2015, ALJ Luke A. Brennan held a hearing in Boise, Idaho, at which time Petitioner, represented by attorney Jacob Bernhardt, appeared and testified. Beth Cunningham, an impartial vocational expert, also appeared and testified at the same hearing.

On November 2, 2015, ALJ Brennan issued a Decision denying Petitioner's claims, finding that he was not disabled within the meaning of the Social Security Act. Petitioner timely requested review from the Appeals Council and, on April 11, 2017, the Appeals Council vacated

**MEMORANDUM DECISION AND ORDER - 1**

ALJ Brennan's Decision and remanded the case back to an ALJ with specific instructions to (1) obtain additional evidence concerning Petitioner's impairments; (2) further evaluate Petitioner's mental and physical impairments, including obesity; (3) give further consideration to Petitioner's maximum residual functional capacity; and (4) obtain supplemental vocational evidence sufficient to allow a comparison between Petitioner's residual functional capacity and the mental and physical demands of his past relevant work.

On July 19, 2017, ALJ Stephen Marchioro held a second hearing in Boise, Idaho, at which time Petitioner, again represented by attorney Bernhardt, appeared and testified.  Kourtney Layton, an impartial vocational expert, also appeared and testified at the second hearing.

On August 15, 2017, ALJ Marchioro issued a Decision denying Petitioner's claim, finding that he was not disabled within the meaning of the Social Security Act.  Petitioner timely requested review from the Appeals Council and, on August 9, 2018, the Appeals Council denied Petitioner's Request for Review, making the ALJ's Decision the final decision of the Commissioner of Social Security.

Having exhausted his administrative remedies, Petitioner filed the instant action on October 6, 2018, arguing that the ALJ's disability determination "is not in accordance with the purpose and intent of the Social Security Act, nor is it in accordance with the law, nor is it in accordance with the evidence, but contrary thereto and to the facts and against the evidence, in that Petitioner is disabled from performing substantial gainful activity."  Pet. for Review, p. 2 (Dkt. 1).  Specifically, Petitioner submits that the ALJ's Decision was not supported by substantial evidence, nor was it based upon the correct legal standard in the following respects: (1) the ALJ erred at step three of the sequential process when he determined Petitioner did not meet Listing 12.05; (2) the ALJ erred when he determined Petitioner's credibility was not consistent with the record without providing clear and convincing reasons supported by

**MEMORANDUM DECISION AND ORDER - 2**

substantial evidence; (3) the ALJ improperly weighed the medical opinions; and (4) the ALJ erred when he assigned an RFC which was not supported by substantial evidence. *See* Pet.'s Brief, p. 10 (Dkt. 17). Petitioner therefore requests that the Court either reverse the ALJ's Decision and find that he is entitled to disability benefits or, alternatively, remand the case for further proceedings. *See id*. at pp. 25-26; *see also* Pet. for Review, p. 2 (Dkt. 1).

## II. <u>STANDARD OF REVIEW</u>

To be upheld, the Commissioner's decision must be supported by substantial evidence and based on proper legal standards. *See* 42 U.S.C. § 405(g); *Matney ex. rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990). Findings as to any question of fact, if supported by substantial evidence, are conclusive. *See* 42 U.S.C. § 405(g). In other words, if there is substantial evidence to support the ALJ's factual decisions, they must be upheld, even when there is conflicting evidence. *See Hall v. Sec'y of Health, Educ. & Welfare*, 602 F.2d 1372, 1374 (9th Cir. 1979).

"Substantial evidence" is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993). The standard is fluid and nuanced, requiring more than a scintilla but less than a preponderance (*see Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

With respect to questions of fact, the role of the Court is to review the entire record to determine whether it contains evidence that would allow a reasonable mind to accept the conclusions of the ALJ. *See Richardson*, 402 U.S. at 401; *see also Matney*, 981 F.2d at 1019. The ALJ is responsible for determining credibility and resolving conflicts in medical testimony

**MEMORANDUM DECISION AND ORDER - 3**

(*see Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)), resolving ambiguities (*see Vincent ex. rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)), and drawing inferences logically flowing from the evidence (*see Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).  Where the evidence is susceptible to more than one rational interpretation, the reviewing court may not substitute its judgment or interpretation of the record for that of the ALJ.  *See Flaten*, 44 F.3d at 1457; *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

With respect to questions of law, the ALJ's decision must be based on proper legal standards and will be reversed or remanded for legal error.  *See Matney*, 981 F.2d at 1019.  The ALJ's construction of the Social Security Act is entitled to deference if it has a reasonable basis in law.  *See id.*  However, to be clear, reviewing federal courts "will not rubber-stamp an administrative decision that is inconsistent with the statutory mandate or that frustrates the congressional purpose underlying the statute."  *See Smith v. Heckler*, 820 F.2d 1093, 1094 (9th Cir. 1987).

## III.  DISCUSSION

### A.    Sequential Process

In evaluating the evidence presented at an administrative hearing, the ALJ must follow a sequential process in determining whether a person is disabled in general (*see* 20 C.F.R. §§ 404.1520, 416.920) – or continues to be disabled (*see* 20 C.F.R. §§ 404.1594, 416.994) – within the meaning of the Social Security Act.

The first step requires the ALJ to determine whether the claimant is engaged in substantial gainful activity ("SGA").  *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  SGA is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves doing significant physical or mental activities.  *See* 20 C.F.R. §§ 404.1572(a), 416.972(a).  "Gainful work activity" is work that is usually done for pay or profit,

whether or not a profit is realized.  *See* 20 C.F.R. §§ 404.1572(b), 416.972(b).  If the claimant

has engaged in SGA, disability benefits are denied, regardless of how severe his physical/mental

impairments are and regardless of his age, education, and work experience.  *See* 20 C.F.R.

§§ 404.1520(b), 416.920(b).  If the claimant is not engaged in SGA, the analysis proceeds to the

second step.  Here, the ALJ found that Petitioner "has not engaged in substantial gainful activity

since the alleged onset date."  (AR 19).

The second step requires the ALJ to determine whether the claimant has a medically

determinable impairment, or combination of impairments, that is severe and meets the duration

requirement.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment or

combination of impairments is "severe" within the meaning of the Social Security Act if it

significantly limits an individual's ability to perform basic work activities.  20 C.F.R.

§§ 404.1520(c), 416.920(c).  An impairment or combination of impairments is "not severe"

when medical and other evidence establish only a slight abnormality or a combination of slight

abnormalities that would have no more than a minimal effect on an individual's ability to work.

*See* 20 C.F.R. §§ 404.1521, 416.921.  If the claimant does not have a severe medically

determinable impairment or combination of impairments, disability benefits are denied.  *See* 20

C.F.R. §§ 404.1520(c), 416.920(c).  Here, the ALJ found that Petitioner has the following severe

impairments:  "restrictive airway disease; osteoarthritis (OA) bilateral knees; intellectual

disability; degenerative disc disease (DDD) lumbar loss, with right greater than left; peripheral

neuropathy; and learning disability."  (AR 20).

The third step requires the ALJ to determine the medical severity of any impairments;

that is, whether the claimant's impairments meet or equal a listed impairment under 20 C.F.R.

Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the

answer is yes, the claimant is considered disabled under the Social Security Act and benefits are

**MEMORANDUM DECISION AND ORDER - 5**

awarded. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant's impairments neither meet nor equal one of the listed impairments, the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. *See id.* Here, the ALJ concluded that Petitioner's above-listed impairments, while severe, do not meet or medically equal, either singly or in combination, the criteria established for any of the qualifying impairments. *See* (AR 21-23).

The fourth step of the evaluation process requires the ALJ to determine whether the claimant's residual functional capacity ("RFC") is sufficient for the claimant to perform past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. *See* 20 C.F.R. §§ 404.1545, 416.945. Likewise, an individual's "past relevant work" is work performed within the last 15 years or 15 years prior to the date that disability must be established; also, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity. *See* 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965. On this point, the ALJ concluded:

> After careful consideration of the entire record, the undersigned finds that since November 15, 2009, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), i.e., lift/carry 20 pounds occasionally and 10 pounds frequently, sit for 6/8 hours, and stand/walk for 6/8 hours, except the claimant is able to only occasionally operate foot controls bilaterally; is able to occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; is able to frequently balance, stoop, kneel, crouch, and crawl; is able to frequently handle and finger with the right upper extremity; can only occasionally be exposed to irritants such as fumes, odors, dusts, and gases; he must avoid all exposure to unprotected heights and unguarded moving mechanical parts; he must avoid all exposure to more than moderate noise; he is limited to work activity that consists of only simple, routine, tasks, with only minimal reading/writing skills; and he is able to tolerate only occasional interaction with the public.

(AR 23).

In the fifth and final step, if it has been established that a claimant can no longer perform past relevant work because of his impairments, the burden shifts to the Commissioner to show

**MEMORANDUM DECISION AND ORDER - 6**

that the claimant retains the ability to do alternate work and to demonstrate that such alternate work exists in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1520(f), 416.920(f); *see also Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993). Here, the ALJ found that Petitioner "has been unable to perform any past relevant work" as "[t]he demands of the claimant's past relevant work exceed the residual functional capacity." (AR 32). Even so, considering Petitioner's age (at least prior to turning 55 on April 19, 2015), education, work experience, and RFC, the ALJ separately concluded that "there were jobs that existed in significant numbers in the national economy that the claimant could have performed," including marker, routing clerk, and mail clerk. (AR 33-34). Therefore, the ALJ concluded that (1) Petitioner "was not disabled prior to April 19, 2015, but became disabled on that date and has continued to be disabled through the date of this decision"; and (2) Petitioner "was not under a disability within the meaning of the Social Security Act at any time through December 31, 2014, the date last insured." (AR 35).

**B.     Analysis**

Petitioner contends that the ALJ erred by (1) failing to conclude at the third step of the sequential process that he met Listing 12.05 and is therefore presumptively disabled; (2) improperly contesting his credibility; (3) improperly weighing the medical opinions; and (4) assigning him an RFC not supported by substantial evidence. *See* Pet.'s Brief, pp. 10-25 (Dkt. 17). Each issue is addressed below.

1.     The ALJ Did Not Err in Evaluating the Severity of Petitioner's Mental Health Impairments Against Listing 12.05 at Step Three of the Sequential Process

As discussed above, an ALJ must evaluate a claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 404.1520(d); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). An

**MEMORANDUM DECISION AND ORDER - 7**

impairment meets a listed impairment "only when it manifests the specific findings described in the set of medical criteria for that impairment."  *See* SSR 83-19; *see also* 20 C.F.R. § 404.1525; *Tackett*, 190 F.3d at 1099 (impairment meets or equals listed impairment only if medical findings (defined as set of symptoms, signs, and laboratory findings) are at least equivalent in severity to set of medical findings for listed impairment).  Though a claimant's burden to establish, "[a]n ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment.  A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so."  *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001).  However, the ALJ is not required to state why a claimant fails to satisfy every criteria of the Listing if the ALJ adequately summarizes and evaluates the evidence.  *See Gonzalez*, 914 F.2d at 1200-01; *Lewis*, 236 F.3d at 512.

Here, the ALJ considered whether Petitioner's mental impairments met or equaled the criteria for Listings 12.05 (intellectual disorders) and 12.11 (neurodevelopmental disorders).  *See* (AR 21-23).  Relevant here, for either condition to be deemed disabling, the functional limitations known as "Paragraph B criteria" must be present, meaning a claimant has one extreme or two marked functional limitations in his ability to (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself.  *See* 20 C.F.R. § 404, Subpt. P, App. 1 §§ 12.05, 12.11.[1]  An "extreme"

---

[1]  These criteria became effective January 17, 2017, and apply to claims that were pending at that time.  *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01 (available at 2016 WL 5341732) ("When the final rules become effective, we will apply them to new applications filed on or after the effective date of the rules, and to claims that are pending on or active the effective date."); *see also* (AR 21-22) (ALJ stating:  "The undersigned notes that, in denying the claimant's disability applications, the Disability Determination Service and the prior Administrative Law Judge both applied the mental health impairment listings then in effect.  The undersigned is applying the new mental health listings currently in effect.").

**MEMORANDUM DECISION AND ORDER - 8**

limitation is characterized by an individual's absolute inability to function in the respective area independently, appropriately, and effectively on a sustained basis; a "marked" limitation means that the claimant's ability to independently, appropriately, and effectively function in a particular area on a sustained basis is "seriously limited." *See* 20 C.F.R. § 404, Subpt. P, App. 1 § 12.00(F)(2)(d)-(e).[2]

The ALJ did not find that such Paragraph B criteria were present.  Instead, the ALJ found that Petitioner had moderate limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and mild limitations in adapting or managing oneself.  *See* (AR 22). Therefore, because Petitioner's mental impairments did not cause at least two marked limitations or one extreme limitation, the Paragraph B criteria were not satisfied and, accordingly, Petitioner's mental impairments did not meet or equal Listings 12.05 or 12.11.  *See id.*

Petitioner submits this was improper, arguing that, as to Listing 12.05, his limitations were (1) "markedly, if not extremely, limited" in the areas of understanding, remembering, or applying information, and (2) "markedly impaired" in the areas of concentrating, persisting, or maintaining pace.  *See* Pet.'s Brief, pp. 13-16 (Dkt. 17).[3]  However, as explained below, the Court is satisfied that the ALJ's step-three-determination is supported by substantial evidence.

---

[2]  In comparison, "mild" and "moderate" limitations indicate that the claimant's ability to independently, appropriately, and effectively function in a particular area on a sustained basis is "slightly limited" and "fair," respectively.  *See* 20 C.F.R. § 404, Subpt. P, App. 1 § 12.00(F)(2)(c).

[3]  This means that, for the purposes of this action, there is no dispute between the parties concerning the ALJ's consideration of (1) Listing 12.05's other criteria generally (e.g., IQ test scores and demonstration of disorder prior to attainment of age 22), or, more specifically (2) Petitioner's ability to interact with others (which the ALJ found to be moderately limited), or (3) Petitioner's ability to adapt or manage himself (which the ALJ found to be mildly limited).  *See generally* (AR 21-23).

**MEMORANDUM DECISION AND ORDER - 9**

To begin, the adaptive function of understanding, remembering, or applying information refers to:

> the abilities to learn, recall, and use information to perform work activities. Examples include:  Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions.

20 C.F.R. § 404, Subpt. P, App. 1 § 12.00(E)(1).  Likewise, the adaptive function of concentrating, persisting, or maintaining pace refers to:

> the abilities to focus attention on work activities and stay on task at a sustained rate. Examples include:  Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

20 C.F.R. § 404, Subpt. P, App. 1 § 12.00(E)(3).

The ALJ concluded that Petitioner has only moderate limitations in these areas (and in the area of interacting with others, alongside only mild limitations in the area of adapting or managing himself), explaining:

> Although the claimant's full scale IQ was recorded as 70 (Ex. 6F), he has worked in the past at unskilled and semiskilled jobs (see the claimant's and the vocational expert's testimonies) and currently sells items at flea markets, which requires him to rent a storage locker to hold his items, get a tax ID, register as a vendor, pay a vendor fee, lift 15-20 pound boxes containing records, t-shirts, hot wheels, etc., set up his area with a table and tent, handle cash transactions, make change, navigate to and from the flea market by himself, and sometimes shop at thrift stores for items to sell.  Additionally, he lives with his disabled girlfriend who does not drive.  The claimant does all of the driving for them, and in fact drove to the hearing.  The claimant was able to negotiate the sale of his RV and use the proceeds to purchase a 5th wheel trailer that he and his girlfriend now live in.  He is also able to attend medical appointments, interact with his health care providers, and provide some assistance to his disabled girlfriend in her activities of daily living.

**MEMORANDUM DECISION AND ORDER - 10**

The claimant is socially competent, and at one point stated to an examining doctor that he had several good friends and no problems with anger. The claimant's attitude and behavior were evaluated as appropriate. (Ex. 6F). He testified that he works at a flea market, which requires interaction with customers. Additionally, the claimant's function report indicated that he spent time with others at least once per week. (Ex. 3E).

On his function report, the claimant asserted that he had no problems with personal care, prepared his own meals daily, and did all house and yard work when able. He indicated that he goes outside daily, alone, and drives. He indicated that he shops in stores once per week, can count change, and socializes once per week. (Ex. 3E). Moreover, the claimant's ability to follow directions was sufficient to allow use of standardized measures of intellectual functioning.

Dr. [Jerry] Doke, a consultative examiner, opined that the claimant would have a "substantially impaired" ability to perform work-related mental activities like remember, sustain concentration, and persist. (Ex. 6F). However, Dr. Doke does not explain what he means by "substantial impairment" in vocational terms. Also, while the claimant is clearly limited in his mental abilities, the claimant's work activity and activities of daily living indicate he is capable of work activity consistent with the adopted residual functional capacity.

The undersigned notes that, as an adult, the claimant had a strong history of full time employment in unskilled and semiskilled jobs performed at substantial gainful activity levels. This supports the conclusion that the claimant has no more than a moderate limitation in his ability to understand, remember, apply information, concentrate, persist, and maintain pace, or interact with others, and no more than mild limitations in adapting and managing himself. Overall the evidence does not support that the claimant has any marked or extreme limitations in any area of mental functioning.

(AR 22-23); *see also* (AR 144-47) (vocational expert testifying to nature of Petitioner's previous unskilled, semi-skilled, and possibly (albeit unlikely) skilled work history).

Petitioner does not challenge these findings in and of themselves, but instead cites to other areas of the record, including Petitioner's testimony. The Court understands such references to be what Petitioner contends are evidence of more significant limitations. *See generally* Pet.'s Brief, pp. 14-16 (Dkt. 17); *but see infra* (discussing ALJ's consideration of Petitioner's credibility). For example, as to his ability to understand, remember, and apply information, Petitioner argues that (1) there are no earnings records to indicate that he was

**MEMORANDUM DECISION AND ORDER - 11**

successful in his work endeavors; (2) owing to his difficulties with reading, writing, and understanding, he required the assistance of friends to fill out forms or simply copied previous work applications; (3) he paid bills with cash because he could not properly write checks; (4) he did not understand directions to call for medication re-fills rather than wait until later appointments; (5) he could not report to medical providers his list of medications; (6) he performed physical therapy incorrectly; (7) his immediate and recent memory, as well as his abstract thinking and ability to do calculations, were poor; (8) testing indicated he had low average ability in verbal concept formulation, acquired knowledge, and visual motor integration; and (9) he required assistance from others to perform his jobs correctly. *See id.* at pp. 14-15 (internal citations omitted).[4]

Similarly, as to his ability to concentrate, persist, and maintain pace, Petitioner argues that (1) Dr. Cristi Hundley's consultative psychological exam found that his ability to maintain attention and concentration was "fair to guarded"; (2) Dr. Hundley recommended further testing due to his "borderline intellectual functioning"; (3) Dr. Doke  indicated that he "had deficiencies in attention and concentration, and mental control and reasoning"; (4) Dr. Doke noted that he was "substantially impaired in his ability to perform work-related mental activities such as remembering, sustaining, concentration, or persistence"; (5) Dr. James Whiteside noted that he "had inconsistent responses to questions throughout the interview that made taking a history very difficult" [and that] [h]is speech was pressured and he appears hypomanic or manic"; (6) Dr. Emily Looney and PA Jared Papa noted that he had difficulty with focusing, had to be redirected,

---

[4]  Several of these arguments – the alleged minimal income from flea markets, the need for assistance from friends in completing applications, and inability to write checks – derive from Petitioner's own testimony, which the ALJ questioned.  *See infra* (determining that ALJ did not err in questioning Petitioner's credibility).

**MEMORANDUM DECISION AND ORDER - 12**

and was a bit tangential in his presentation"; and  (7) Dr. Dean Defrees noted that he was a difficult historian.  *See id.* at pp. 15-16 (internal citations omitted).

However, Petitioner does not connect these references from the record to a corresponding finding that Petitioner necessarily has something other than moderate limitations in his ability to both understand, remember, and apply information on the one hand, and concentrate, persist, and maintain pace on the other.  Said another way, such evidence without more arguably confirms what the ALJ found – namely, that Petitioner has limitations in these areas, but and that such limitations rise only to moderate levels.[5]  Whether the record *also* can be read to support a finding that Petitioner has more substantial limitations is immaterial and ignores the standard of review applicable to the ALJ's findings in this setting.  *See supra.*  Instead, substantial evidence exists to support the ALJ's step-three-determination that Petitioner's mental conditions do not meet or equal a listed impairment, including Listing 12.05.  Petitioner's arguments to the contrary do not upend the ALJ's findings in these respects.

2.      The ALJ Did Not Err in Questioning Petitioner's Credibility

As the trier-of-fact, the ALJ is in the best position to make credibility determinations and, for this reason, his determinations are entitled to great weight.  *See Anderson v. Sullivan*, 914 F.2d 1121, 1124 (9th Cir. 1990); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities).  In evaluating a claimant's credibility, the ALJ may engage in ordinary techniques of credibility evaluation, including consideration of claimant's reputation for truthfulness and inconsistencies in claimant's testimony, or between claimant's testimony and

---

[5]  Separately, even if it can be argued that *one* of these adaptive functions rises to the level of a marked limitation, the other at-issue adaptive function must also be so elevated (assuming one of the two is not characterized as an extreme limitation) for Petitioner's mental impairments to meet or equal Listing 12.05.  *See supra.*

**MEMORANDUM DECISION AND ORDER - 13**

conduct, as well as claimant's daily activities, claimant's work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains.  *See Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).  Also, the ALJ may consider location, duration, and frequency of symptoms; factors that precipitate and aggravate those symptoms; amount and side effects of medications; and treatment measures taken by claimant to alleviate those symptoms.  *See* SSR 96-7p.  In short, "[c]redibility decisions are the province of the ALJ."  *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).  However, in rejecting a claimant's testimony, the ALJ must make specific findings stating clear and convincing reasons for doing so.  *See Holohan*, 246 F.3d at 1208 (citing *Reddick*, 157 F.3d at 722).

Here, Petitioner alleges disabling limitations resulting from "depression, hearing loss in both ears, carpal tunnel, migraines, pain in both feet, back problems, high blood pressure, and high cholesterol."  (AR 452) (Petitioner stating he stopped working on November 15, 2009 because of his conditions).  For example, within his September 24, 2013 "Function Report – Adult," Petitioner states:

- "On December 16, 1984, I was involved in a head-on collision.  Injured my back, neck, hip, right knee, shattered left foot.  In 1986 on September 5, I was rear-ended with back injury.  In 1992 on March 6, truck lost breaks on downhill grade, injured neck, hips, back.  In 1999 on February 12, was rear-ended again. Lower back injured.  I have never overcome all of my injuries.  I live in pain daily."  (AR 432).

- "Too much pain to sleep very good."  (AR 433).

- He shops "one time per week for about 20 minutes because [he] can't walk or stand long."  (AR 435).

- "I would like to walk my dogs, but I can't walk very far."  (AR 436).

- His conditions affect lifting (25-30 pounds), squatting ("hurts my right hip and knee"), bending ("lower back strain"), standing ("cannot stand longer than 10-15 minutes"), reaching ("hurts my shoulders"), walking ("possibly 200 to 300

yards at the most"), sitting ("can sit for 30-35 minutes, then have to get up"), kneeling ("hurts my knees and back"), hearing ("deaf in right ear, about 73% hearing in left ear"), stair climbing ("hurts my feet, knees, hips, and back"), seeing ("since cataract surgery in 2008, vision is somewhat blurred"), memory ("some memory loss due to heat strokes"), concentration ("my concentration span is very short"), understanding ("I often misunderstand what people say"), following instructions ("lack of understanding"), and using hands ("sometimes I drop things").  *See* (AR 437-38).

- He can walk "maybe one block" before needing to stop and rest, and cannot resume walking for "five or more minutes."  (AR 437).

- "I have a very short attention span."  *Id*.

- Does not follow written and spoken instructions well.  *See id*. ("Not able to understand complete instructions.").

- Does not handle stress or changes in routine well.  *See* (AR 439).

He went on to more-or-less confirm as much during the July 19, 2017 hearing, testifying

in response to questions from his attorney and the ALJ as follows:

ALJ:   Okay.  All right.  All right.  Well, what do you think prevents you from working?

PET:   My feet, my back.  Just everything, you know.  Being out in the heat and stuff.  Sometimes I can't do shows because of the heat and I haven't had one in a long time because of the 100-degree weather.  I just don't . . . do them because I'm . . . not able.

ALJ:   – what have they told you is wrong with your feet?  And the reason why I ask that is they've done a lot of testing.  Did all . . . sorts of testing and I didn't see where any – they've –

PET:   They don't want to put a name on it.  It to me is like neuropathy, you know.  Something like that.  They don't actually put anything on it, but – tell me anything.

ALJ:   But they've done one of those nerve conduction . . . studies . . . and that was normal and –

PET:   That's what they say.

ALJ:   And they've – and your – I think you've seen a neurosurgeon or orthopedic surgeon and they've indicated that whatever problems you're having don't appear to be from your back issues.  Is that your understanding?

**MEMORANDUM DECISION AND ORDER - 15**

PET:   Well, that's what they say that they're trying to treat it like that.  But it's just – my feet are like dead nerves or whatever.

. . . .

ALJ:   Oh.  Sounds good.  Okay.  Very good.  Okay.  Well – and again help me out here.  Why do you think you're not capable of working?  I mean just –

PET:   Well, I'm just – my legs and feet and walking short distance is pretty tough now.  I'm a lot worser when – now than I was when I was working.  I was hurting, but I just bared it.  But now I'm not able to even do those – that work.

ALJ:   Okay.

PET:   I'm not able to.

ALJ:   Okay.  Well, the – how far do you think you can walk or how – in terms of time.  How long do you think you can walk?

PET:   I can . . . probably almost do light shopping and stuff.  It's about max that I can do on that.  Sometimes I can't even do that.

ALJ:   Well, how long – in terms of you – let's say you had to go outside and just start to walk down the sidewalk.

PET:   Oh, I wouldn't last very far.

ALJ:   Well, how long do you think in terms of time?

PET:   Really, I don't know.

ALJ:   Well, give me your best guess.

PET:   One to another.  Probably one light to another light maybe.

. . . .

ALJ:   Okay.  Okay.  Well, I see you got a disabled hunting and fishing license.

PET:   Um-hum.

ALJ:   So how much hunting and fishing do you do?

**MEMORANDUM DECISION AND ORDER - 16**

PET:    I don't do any.  I can't do it.  I thought I could.  I can't even do that, stand there and fish and I can't do that.  I've tried. . . .  I can't do it.  I'd hurt too much to – time I get back to the car, I'm done. . . .

ALJ:    When's the last time you went hunting?

PET:    I haven't went hunting at all.  It was just a combination license.  I just went ahead and got that at the time. . . .  I've only fished – tried to fish two times out of this whole – that whole time and I couldn't hardly do it . . . because usually it's too far to walk and stand.

. . . .

ATT:    Could you read a work order –

PET:    No.

ATT:    – and understand the directions for . . . yourself?

PET:    No.  I've always had to go to the boss or have one of my coworkers read it to me and try to make some understanding of what I was doing.  Supposed to do.

ATT:    You mentioned with the delivery job that you also had to load the truck . . . before leaving on your route?

PET:    Yes.

ATT:    How did you know what to up in the truck?

PET:    They were all re-orders.  They – the other stores well, they call in orders. they had it all made up for me. . . .  All I had to do is pick it up and put it in the truck.

ATT:    So somebody else had it all organized. . . .  It was . . . waiting in a pile.

PET:    Exactly.

ATT:    So.  You weren't reading the orders . . . and pulling items . . . to put on your truck?

PET:    No. . . .  They were already stacked there ready to go.

ATT:    Okay.  How did you learn your route?

PET:    That was just because I knew the town and my boss took me around, showed me all the stops. . . .  All the stops, what I need to do and that was – yeah.

**MEMORANDUM DECISION AND ORDER - 17**

ATT:   Okay.  Could you – would you have been able to look at addresses and read directions and find a new location on your own?

PET:   Probably not.  I have a hard time with that . . . .

. . . .

ATT:   Did you have issues on any of your jobs with making mistakes?

PET:   Oh yeah.

ATT:   Like what?  Can you think of some . . . examples?

PET:   Just stuff – it was either misunderstand.  I didn't understood it or stuff like that.

. . . .

ATT:   Okay.  All of the paperwork involved with the Social Security Disability Claim, the various forms that you need to fill out, how did you accomplish that?

PET:   I had my friend Mark or someone fill them out for me because I'm not able. Just very – the stuff that I know personally about myself that any – if it was something to write down about a condition or whatever, I can't do that.

(AR 99-100, 130-38).

The ALJ concluded that Petitioner's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms.  However, the ALJ said that Petitioner's "statements concerning the intensity, persistence, and limited effects of these symptoms are not fully supported [by the record]."  (AR 28); *see also* (AR 24) ("The claimant provided the following testimony that is not fully consistent internally or with the record . . . ."). As described to follow, the ALJ's justification in this regard amounts to clear and convincing reasons for questioning Petitioner's credibility.

First, in challenging the ALJ's consideration of his credibility, Petitioner relies on instances in the record where his symptomology is confirmed before reframing the issue as the

**MEMORANDUM DECISION AND ORDER - 18**

ALJ's failure to explain why Petitioner's allegations surrounding those same symptoms are not credible. *See, e.g.*, Pet.'s Brief, pp. 18-20 (Dkt. 17) (repeating Petitioner's *challenged testimony* about needing assistance to complete forms and experiencing increased pain after working intermittently at flea markets, and referencing medical records showing "moderate lower facet joint anthropathy," "advanced degenerative facet hypertrophy with mild degenerative disc disease at L4-L5 which resulted in moderate central canal stenosis and moderate left foraminal narrowing," diminished (and normal) Achilles tendon flexes, "osteoarthritic changes in the lumbar spine at L4-5," "degenerative changes and a bulging disc at L4-5," and general existence of mental limitations, before concluding:  "[T]he overall complaints were consistent in that Petitioner suffered foot and back pain consistent with the objective medical evidence."). However, the ALJ did not reject Petitioner's allegations that he suffers from these impairments, or that these impairments impact his ability to work. Indeed, the ALJ concluded in no uncertain terms that Petitioner suffers from, *inter alia*, osteoarthritis, intellectual disability, degenerative disc disease, osteoarthritis, peripheral neuropathy, and learning disability, and that such impairments are severe. *See supra* (citing (AR 20)).

The relevant part of the ALJ's decision on this issue is that the ALJ questioned the *extent* to which these recognized impairments and related symptoms prevented Petitioner from working at all.  But, even in doing so, the ALJ specifically accounted for Petitioner's limitations during the fourth step of the sequential process (RFC analysis).  *See* (AR 23) (Petitioner has RFC to perform light work, except that Petitioner "is able to only occasionally operate foot controls bilaterally"; "is able to occasionally climb ramps and stairs but never ladders, ropes or scaffolds"; "must avoid all exposure to unprotected heights and unguarded moving mechanical parts"; "is limited to work activity that consists of only simple, routine, tasks, with only minimal reading/writing skills"; and "is able to tolerate only occasional interaction with the public").

**MEMORANDUM DECISION AND ORDER - 19**

Therefore, to the extent Petitioner's arguments depend upon the existence of certain limiting

impairments or symptoms, they miss the point because the ALJ already acknowledged as much

and the provided limitations in the RFC accommodate Petitioner's corresponding symptoms.

The question is not whether such limitations/symptoms exist, but whether Petitioner is able to

work even with such limitations.

Second, the ALJ concluded that Petitioner's daily activities were inconsistent with his

allegations of disabling symptoms and limitations, pointing out:

> The evidence in the record reflects the claimant's functional limitations are not as
> significant and limiting as he has alleged.  He alleged significant physical and
> mental limitations.   However, his daily activities are more robust than his
> allegations of severe limitations suggest.  In his function report, the claimant
> asserted that he had no problems with personal care, prepared his own meals daily,
> and did all house and yard work when able.  He indicated the he goes outside daily,
> alone, and drives.  He indicated that he shops in stores once per week, can count
> change, and socializes once per week.  (Ex. 3E).  Per his testimony, the claimant
> lives with his girlfriend, handles finances, is the sole driver in the household, goes
> to swap meets and resells items, was able to sell his motor home to buy his current
> residence, attends doctor appointments including physical therapy, drives his car as
> needed (including driving himself to the hearing).  These activities of daily living
> are consistent with the above residual functional capacity assessment, and are
> inconsistent with the disabling levels of pain and mental health symptoms alleged
> by the claimant.  They suggest a level of functioning greater than what he has
> alleged in his application and testimony.

(AR 29); *see also* (AR 24) (ALJ addressing Petitioner's "problems with mental activities such as

learning, reading/following directions, and filling out forms," but noting that his ability to drive

"clearly demonstrates concentration and persistence, the ability to operate hand and foot controls,

and the ability to handle stressful situations inherent in operating a motor vehicle on public

roads," along with ongoing involvement at flea markets and ability to handle cash transactions,

lift 15-20 pounds, and use cell phone); (AR 25) (ALJ stating:  "He was 'very sore' and had 'a lot

of tightness in his back' in May 2017, but he reported he had a 'busy weekend' and 'did a lot of

lifting,' which is inconsistent with his allegations." (citing (AR 833, 839)); (AR 515) (Petitioner

**MEMORANDUM DECISION AND ORDER - 20**

stating at October 19, 2010 evaluation that "yesterday's activities" included "pull[ing] some logs with my truck, pulled them out of the ditch.").

Appropriately then, the ALJ did not reject Petitioner's complaints that he suffers from certain impairments; rather, in considering and discussing Petitioner's daily activities (including those reflected in the record), the ALJ's focus was on Petitioner's claim that he cannot work *because* those impairments allegedly limit his ability to work. *See, e.g.*, *Madrid v. Colvin*, 2016 WL 1161987, at *10, n.8 (N.D. Cal. 2016) ("The Ninth Circuit has held that 'the adjudicator may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence.' As discussed herein, the ALJ did not reject Plaintiff's allegations that she suffers hand pain, but rather evaluated record evidence regarding Plaintiff's alleged diminished dexterity.") (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 346-47 (9th Cir. 1991)); *see also Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) ("Even where those activities suggest some difficulty in functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of totally debilitating impairment.").

Third, the ALJ referenced Petitioner's "strong work history" despite the contended pain and functional/mental limitations:

> The claimant does not have any skilled past relevant work (SVP 5 or above) but he does have semi-skilled past relevant work and the evidence does not support his testimony that he had difficulty performing the mental requirements of these jobs. As a matter of fact, he was a long-time employee at the winery, he maintained his employment without being terminated, and there is no evidence other than his testimony to support a conclusion that this was accommodated work. Also, there is no evidence of accommodated work. His long work history demonstrates that he has been able to work full time with neuropathy and his mental limitations for many years.

(AR 29). The inference that can be reasonably drawn from the inconsistency between Petitioner's allegations of disability and his past work history is, on its own, a "specific, clear,

and convincing reason" to reject his testimony about the severity of his symptoms.  *See Thomas*, 278 F.3d at 958-59; *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).

Fourth, as to the objective medical evidence, the ALJ found that "the record does not support [Petitioner's] allegations as to symptom severity and degree of functional limitation." (AR 24).  In particular, the ALJ noted Petitioner's neuropathy claims, but then contrasted them with (1) a nerve conduction study performed on his lower extremities that was normal, (2) a neurosurgeon finding no connection between his back pain and feet pain, (3) no surgery or emergency room visits or hospitalizations, and (4) no diagnosis for his peripheral neuropathy.  *See* (AR 24) (citing (AR 509, 525, 592-94, 597, 620-21)).  Similarly, the ALJ acknowledged Petitioner's allegations of pain and functional limitations, before pointing out that there is no evidence of an inability to ambulate effectively because Petitioner walks without an assistive device and the record generally notes his ability to maintain a normal gait.  *See* (AR 24) (citing (AR 510, 524, 710, 722)).[6]

In short, the medical record's descriptions of Petitioner's medically-supported impairments/limitations is disconnected from Petitioner's claimed inability to work.  *See, e.g.*, (AR 26) (ALJ stating:  "In consideration of the evidence above, the claimant's lumbar spine degenerative disc disease causes some moderate limitations.  However, given the discrepancies between claimant's subjective reports (such as pain in excess of 10 on a scale of 10), and the findings on physical examination and imaging and the claimant's longitudinal trend of improvement with treatment, the claimant's lumbar spine concerns are adequately accommodated by the above residual functional capacity assessment."); *see also* (AR 27) (ALJ

---

[6]  The ALJ further considered Petitioner's claims of possibly-disabling sleep apnea, hearing loss, and hand impairment when developing Petitioner's RFC.  *See* (AR 26-27).

**MEMORANDUM DECISION AND ORDER - 22**

stating: "Regardless of the exact diagnosis, the claimant's neuropathic type symptoms are accounted for by the limitations in the above residual functional capacity.").

Together, these reasons offer clear and convincing explanations as to why the ALJ found Petitioner's testimony not entirely credible.  Remember here that the Court's role is not to decide whether Petitioner is disabled under the applicable rules and regulations or whether he suffers from chronic pain.  On those points, the Court agrees that Petitioner identifies (or at least suggests the existence of) conflicting evidence in support of his position.  Even though conflicting evidence may not have been given the weight Petitioner would have preferred, the ALJ's decision to doubt Petitioner's credibility in denying disability benefits contains clear and convincing reasons for doing so.  The Court must use that measuring stick, and as required by controlling law, the ALJ will not be second-guessed as to such conclusions, on the record here and the justifications provided.  *See Batson*, 359 F.3d at 1193 ("[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision.") (internal citations omitted).  Therefore, the Court will not substitute its judgment when the evidence in the record can support the ALJ's findings.

> 3.    The ALJ Properly Considered the Conflicting Medical Opinions

Petitioner faults the ALJ for improperly giving greater weight to a non-examining physician, Dr. Dave Sanford, over examining physicians Drs. Hundley and Doke without providing clear and convincing reasons for doing so.  *See* Pet.'s Brief, pp. 21-24 (Dkt. 17).

ALJs are to resolve ambiguities and conflicts in the medical record.  *See Magallanes*, 881 F.2d at 750.  An ALJ must provide clear and convincing reasons for rejecting the uncontradicted medical opinion of a treating or examining physician, or specific and legitimate reasons for rejecting contradicted opinions, so long as they are supported by substantial evidence.  *See*

**MEMORANDUM DECISION AND ORDER - 23**

*Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).  However, the ALJ need not "accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."  *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012).  Additionally, the physicians' opinions may be properly discounted if they are based on internal inconsistencies, contain inconsistencies with other evidence in the record, or for other factors the ALJ deems material to resolving ambiguities.  *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601-02 (9th Cir. 1999).  Finally, an ALJ is not bound to a physician's opinion of a claimant's physical condition on the ultimate issue of disability.  *Magallanes*, 881 F.2d at 751.  If the record as a whole does not support the physician's opinion, the ALJ may reject that opinion.  *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004).  Items that may not support the physician's opinion include clinical findings from examinations, conflicting medical opinions, conflicting physician's treatment notes, and the claimant's daily activities.  *See id*.; *see also Bayliss*, 427 F.3d 1211; *Connett v. Barnhart*, 340 F.3d 871 (9th Cir. 2003); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595 (9th Cir. 1999).  Against those standards, the ALJ properly considered the opinions of Drs. Hundley and Doke.

a.      *Dr. Hundley*

Dr. Hundley performed a "mental status evaluation" of Petitioner on October 19, 2010.  *See* (AR 514-16).  At that time, Petitioner denied problems with his mood or his behavior, but said that his thinking was "just not very good," that he is "confused about [his] life in general," and that he is "not sure what [he] should be doing."  (AR 516).  Dr. Hundley gave a provisional diagnosis of borderline intellectual functioning; a Global Assessment of Functioning (GAF) score of 62;[7] described as "fair to guarded" Petitioner's ability to understand and remember

---

[7] GAF is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations.  *See American Psychiatric*

simple instructions, and ability to maintain attention and concentration; and characterized as

"fair" Petitioner's ability to interact appropriately in a work setting and handle the stresses

typically associated with a work environment.  (AR 516).

The ALJ gave these opinions "only some weight" because:

it [was given] well prior to the established onset date, was a one-time examination of the claimant, was largely based on the claimant's subjective report rather than the claimant's daily activities and other evidence that also reflects an ability to function, and it noted [borderline intellectual functioning], but reflected a [GAF] score of 62.

(AR 31).

Petitioner contends that conclusion cannot withstand scrutiny under the clear and

convincing standard.  *See* Pet.'s Brief, pp. 21-23 (Dkt. 17).  The undersigned disagrees. To

begin, Dr. Hundley's opinions are not uncontradicted; therefore, the ALJ need only give specific

and legitimate reasons for questioning them.  And, while Dr. Hundley's mental status evaluation

preceded Petitioner's alleged onset date (and therefore may not represent a specific and

legitimate reason),[8] the ALJ's other bases for challenging Dr. Hundley's opinions suffice –

---

*Ass'n, Diagnostic and Statistical Manual of Mental Disorders*, 32-34 (4th ed. rev. 2000). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31-40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood"; GAF scores of 41-50 represents "serious"; GAF scores of 51-60 represent "moderate"; scores of 61-70 represent "mild"; and scores of 90 or higher represent absent or minimal symptoms of impairment.  *Id*. at 32.

[8]  On this point, Respondent argues that "this was not a mistake on the ALJ's part" where "[t]he ALJ found Plaintiff disabled as of April 2015, due to a change in his age category" such that "Dr. Hundley's 2010 report dated approximately five years earlier."  Respt's Brief, p. 12, n.2 (Dkt. 18); *but see* Pet.'s Reply Brief, p. 7 (Dkt. 19 ("Although Dr. Hundley's opinion was well before the established onset date, it was within the adjudicatory period.  Petitioner obtained no treatment that would have improved his mental limitations between Dr. Hundley's opinion and the established onset date.  The ALJ did not adjust the onset date due to mental health limitations; the onset date was adjusted due to Petitioner's age change three-and-one-half months after his date last insured.").  Formal resolution of this issue is not necessary in light of the other reasons supplied by the ALJ for discounting Dr. Hundley's opinions.  *See infra*.

**MEMORANDUM DECISION AND ORDER - 25**

namely, that Petitioner's daily activities (*see supra*) and GAF score indicate that Petitioner may not be as disabled as Dr. Hundley's potentially suggests. Moreover, Dr. Hundley's references to Petitioner's "fair to guarded" abilities do little to quantify Petitioner's limitations in this setting; Petitioner's argument that such a comment "would be consistent with moderate to marked limitations" is understandable but does not make it so. Pet.'s Brief, p. 22 (Dkt. 17). Therefore, against the balance of the record, there was no error in the ALJ's decision to question portions of Dr. Hundley's opinions.

> b.    *Dr. Doke*

Dr. Doke performed a mental status examination on November 19, 2013. *See* (AR 533-37). Dr. Doke's "statement of problem" was that: "Mr. Hiatt simply indicates that he has lost his memory, his short-term memory is bad, and he can look at something and forget it just like that." (AR 533-34). Intelligence testing showed a full scale IQ of 70. Petitioner was diagnosed with a learning disorder, mild mental retardation, and dependent personality traits, and Dr. Doke said that Petitioner "is substantially impaired in his ability to perform work-related mental activities such as remembering, sustaining concentration or persistence" and "may be impaired in his ability to work due to his mental retardation and difficulty with processing speed and working memory." (AR 537).

"Only some weight" was given to Dr. Doke's opinions by the ALJ:

> Dr. Doke conducted psychological testing that showed [borderline intellectual functioning], which supports his opinion, but he did not see additional evidence showing good activities of daily living and [Petitioner's] flea market work activity. Dr. Doke did not state limitations in concrete functional terms and this was a one-time examination. He also did not explain what he meant by "substantially impaired" and he used an ambiguous term "may be impaired." This last statement seems to contradict the previous statement and makes it unclear as to what exactly Dr. Doke believes are the claimant's specific vocational limitations. Nevertheless, the results of psychological testing and Dr. Doke's concerns were taken into account by including the mental limitations in the above residual functional capacity.

**MEMORANDUM DECISION AND ORDER - 26**

(AR 32).  Petitioner again contends that the ALJ's handling of Dr. Doke's opinions are
insufficiently supported.  *See* Pet.'s Brief, pp. 23-24 (Dkt. 17).

As before, the ALJ concluded that Petitioner's daily activities undermine Dr. Doke's
opinion that Petitioner may be incapable for performing the mental tasks associated with certain
work activity.  *See supra*.  Regardless, whatever limitations Dr. Doke ascribes to Petitioner, they
cannot be understood in terms transferrable to Petitioner's actual abilities – as the ALJ said, what
does Dr. Doke mean by "substantially impaired" in the framework supplied by the Social
Security Act, especially when he later walks the statement back by saying Petitioner "may [only]
be impaired in his ability to work."  These are irresolvable questions and, when combined with
other evidence supporting contrary conclusions along with conflicting opinions, represent
sufficient reasons for rejecting (at least in part) Dr. Doke's opinions on what could amount to a
disability determination.  *See Rodriguez v. Bowen*, 876 F.2d 759, 762 (9th Cir. 1989) (treating or
examining physician's opinion on the ultimate issue of disability not conclusive); *see also* SSR
96-5p, 1996 WL 374183, *2 ("The regulations provide that the final responsibility for deciding
[whether an individual is 'disabled' under the Act] . . . is reserved to the Commissioner.").

The record does establish that Petitioner suffers from several impairments (and the ALJ
describes certain impairments as "severe, *see* AR 20) that impact his ability to work.  However,
the ALJ provided specific legitimate reasons for rejecting or questioning certain opinions
contained in the medical record.  It follows that the ALJ would not give those opinions the
weight Petitioner argues that they deserved.  But, the ALJ did consider such opinions in the
context of the surrounding medical record.  Again, this Court's role does not resolve the
conflicting opinions and decide whether Petitioner is once-and-for-all disabled as that term is
used within the Social Security regulations when the ALJ's decision that Petitioner is not

**MEMORANDUM DECISION AND ORDER - 27**

disabled is supported by the record.  In this record, conflicting medical opinions, testimony, and

accounts do inform the ALJ's consideration of and decisions upon the various opinions.  The

ALJ discounted certain opinions while crediting others.  He did so based upon clear and

convincing, specific, and legitimate reasons.  Hence, because the evidence can reasonably

support the ALJ's conclusions in these respects, this Court will not substitute its judgment for

that of the ALJ's even if this Court were to have a different view.  *See Richardson*, 402 U.S. at

401; *Matney*, 981 F.2d at 1019.

       4.       <u>The ALJ Did Not Err in Assigning Petitioner's RFC</u>

The ALJ concluded that Petitioner's RFC allows the Petitioner to perform light work

with certain limitations, and that there are jobs in the national economy that do not require

activities precluded by his RFC.  *See* (AR 23-35).  "Based upon the substantial weight of the

objective medical evidence, the claimant's course of treatment, his activities of daily living, his

work history, and the opinions of the examining and non-examining physicians," the ALJ

reasoned, "the claimant retains the residual functional capacity for the above-identified range of

light work."  (AR 32).  Petitioner faults the ALJ on this issue for having "improperly dismissed

Petitioner's testimony by providing no clear and convincing reasons to do so and failed to

correctly weigh the medical opinions" and that, "[w]hen those opinions and testimony are

properly considered along with the objective medical evidence, the RFC was not supported by

substantial evidence."  Pet.'s Brief, p. 25 (Dkt. 17).

This argument rises and falls with the Court's prior consideration of those issues (*see

supra*).  Therefore, it is not necessary to repeat the prior discussion of the merits of the ALJ's

RFC determination.  For the reasons already set out, substantial evidence exists to support the

ALJ's findings at the fourth and fifth steps of the sequential process.  *See Bayliss v. Barnhart*,

427 F.3d 1211, 1217 (9th Cir. 2005) (ALJ properly relied on vocational expert's testimony

**MEMORANDUM DECISION AND ORDER - 28**

because "[t]he hypothetical that the ALJ posed to the [vocational expert] contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record.").

## IV. CONCLUSION

The ALJ, as fact-finder, must weigh the evidence, draw inferences from facts, and determine credibility. *Allen*, 749 F.2d at 579; *Vincent ex. rel. Vincent*, 739 F.2d at 1394; *Sample*, 694 F.2d at 642. If the evidence is susceptible to more than one rational interpretation, one of which is the ALJ's, the Court may not substitute its interpretation for that of the ALJ. *Key*, 754 F.2d at 1549. The ALJ has provided reasonable and rational support for his well-formed conclusions, even if such evidence is susceptible to a different interpretation. Accordingly, the ALJ's decisions as to Petitioner's disability claim were based on proper legal standards and supported by substantial evidence. Therefore, the Commissioner's decision that Petitioner is not disabled within the meaning of the Social Security Act is supported by substantial evidence in the record and is based upon an application of proper legal standards.

The Commissioner's decision is affirmed.

## V. ORDER

Based on the foregoing, the decision of the Commissioner is AFFIRMED and this action is DISMISSED in its entirety, with prejudice.

DATED: June 1, 2020

Ronald E. Bush
Chief U.S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 29**